UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
VERUS PHARMACEUTICALS, INC.       :
                                  :
                Plaintiff,        :
        v.                        :
                                  :
ASTRAZENECA AB AND TIKA LÄKEMEDEL :
AB,                               :
                                  :
                Defendants.       :
----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/16/10

09 Civ. 5660 (BSJ)
**Opinion & Order**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

This action arises out of a contractual relationship between
Plaintiff Verus Pharmaceuticals, Inc. ("Plaintiff" or "Verus")
and Defendants AstraZeneca AB ("AstraZeneca") and Tika Läkemedel
AB ("Tika") (collectively, "Defendants")[1] for the development of
a treatment for pediatric asthma. Before the Court is
Defendants' motion for dismissal pursuant to Federal Rules of
Civil Procedure 9(b) and 12(b)(6). For the reasons set forth
below, Defendants' motion is GRANTED.

## BACKGROUND

### 1. Negotiations

Verus owned rights to intellectual property believed to be
capable of providing the basis for a new delivery system for a
pediatric asthma treatment. AstraZeneca, a pharmaceutical
manufacturer, was interested in developing those assets into a
potential product that might eventually gain FDA approval.
(Compl. ¶¶ 1, 4, 12-14.) According to the Complaint,

---

[1] Defendant Tika is a wholly-owned subsidiary of AstraZeneca.

1

during negotiations "Defendants represented to Verus, among other things: (i) that they were experts in the fields of drug development; (ii) that they possessed unparalleled expertise; and (iii) that they would fully apply their expertise and their resources in order to move [the product] through, at the very least, an End of Phase 2 [("EOP II")] meeting with the FDA." (Compl. ¶ 12.)[2]  Verus alleges that these representations--in particular AstraZeneca's alleged representation that "Defendants possessed the resources, the skill, and the willingness to develop [the product] with Verus through an End of Phase 2 meeting with the FDA"--induced it to enter into a partnership with AstraZeneca.  (Compl. ¶ 20.)[3]

## 2. The Agreements

Following these negotiations, the parties entered into three contracts: the Asset Purchase Agreement ("APA"), the Repurchase Option Agreement ("ROA") and the Collaboration Services Agreement ("CSA") (collectively, the "Agreements").  The Agreements, which

---

[2] An EOP II Meeting is between a pharmaceutical company sponsoring an Investigational New Drug Application ("IND")--the issuance of which requires FDA approval--and the FDA.  It occurs prior to entering into large-scale clinical trials in the target treatment population.  As the regulations explain:

> Meetings between a sponsor and the agency are frequently useful in resolving questions and issues raised during the course of a clinical investigation.  FDA encourages such meetings to the extent that they aid in the evaluation of the drug and in the solution of scientific problems concerning the drug, to the extent that FDA's resources permit.  The general principle underlying the conduct of such meetings is that there should be free, full, and open communication about any scientific or medical question that may arise during the clinical investigation.

21 C.F.R. § 312.47.
[3] Verus explains that it was eager to have an EOP II Meeting with the FDA because Verus "was keen to receive the feedback and guidance that the FDA would provide concerning the safety and efficacy of [the product]." (Pl.'s Opp. Mem. 8.)

are governed by New York law, set forth the process for the transfer and ownership of the assets and for product development.

First, Defendants purchased the assets for $30 million, thereby obtaining the right to develop them over a period of time with a contractually-specified expiration on October 2, 2008 (the "EOP II Drop Dead Date"). (APA § 2.6.) Thereafter, Defendants had the option, "in [their] sole discretion," to permanently own the assets by making an additional payment to Verus of $280 million (the "Earnout Payment"). (APA § 2.6; APA Ex. 1 at S-5.) Defendants' option terminated on the Earnout Payment Termination Date ("EPT Date"), which is defined as follows:

> "Earnout Payment Termination Date" means the date which is the earlier of (i) forty-five (45) days after the issuance of official minutes by the FDA of the end-of-Phase 2 meeting held with the FDA . . ., [or] (ii) the EOP II Drop Dead Date . . . provided, however, that in the event the official minutes of the end-of-Phase 2 meeting has not been issued or the end-of-Phase 2 meeting has not occurred by the EOP II Drop Dead Date and [Tika] is using commercially reasonable best efforts to mitigate such delay, the EOP II Drop Dead Date shall be automatically extended until the date on which the official minutes of the end-of-Phase 2 meeting are actually issued plus forty-five (45) days.

(APA Ex. 1 at S-6.) This provision was evidently intended to give Verus a fixed date after which Verus could exercise its option to reacquire the assets (described below). But because unavoidable delays can occur during drug development, the provision also permits AstraZeneca to extend the EOP II Drop Dead Date from October 2, 2008 as long as it was using commercially reasonable best efforts to develop the assets and reach an EOP II

3

Meeting with the FDA.

If AstraZeneca declined to exercise its option to purchase the assets for $280 million, Verus then had the option under the ROA to repurchase the assets from AstraZeneca for one dollar.[4] Verus would also retain AstraZeneca's original $30 million. Following the EPT Date, Defendants had five business days to deliver to Verus a Loss Amount Certificate ("LAC"), which in turn triggered a 45-day period for Verus to decide whether to exercise its repurchase option. (APA § 9.6.2; ROA § 2.2.). The LAC was to provide Verus with information regarding the assets that it was entitled to repurchase. (APA § 9.6.2; ROA § 12.4.)[5]

The CSA governed AstraZeneca's work on the development of the assets during the period between Defendants' $30 million payment and the exercise of either party's option. In general, the CSA provided that Defendants would develop the products in accordance with a Joint Development Plan that called for various scientific, pre-clinical and clinical studies. The studies were described in Study Schedules. (CSA § 2; Compl. Exs. D & E.) The CSA also established a Joint Development Committee ("JDC") made

---

[4] The repurchase price was calculated as follows:
> [Verus] shall assume the Assumed Liabilities and shall pay to [Tika] an aggregate amount in cash (the "Repurchase Price") equal to the sum of (i) $1.00 plus (ii) an amount equal to the Phase III Prepaid Closing Amount plus (iii) the aggregate Loss Amount set forth on the Loss Amount Certificate delivered pursuant to Section 9.6.2 of the [APA] plus (iv) the pre-paid costs incurred by Tika . . . plus (v) the Clinical Trial Supplies Purchase Price . . . .

ROA § 2.3.1. As discussed below, the repurchase price was ultimately one dollar under this formula.

[5] The Loss Amount is the aggregate of the contractual indemnity claims submitted by AstraZeneca to Verus. (Defs.' Reply 10; APA §§ 9.6.1, 9.6.2; ROA § 12.4)

4

up of two AstraZeneca representatives and two Verus

representatives, and it set forth governing and voting procedures

for the JDC. In the event of a tie vote, AstraZeneca was given

the power to cast a tie-breaking vote. (CSA § 4.) The CSA

empowered the JDC to amend or modify any Study Schedule provided

that the change would not "materially delay the timing of the

expected End-of-Phase II Meeting Date," unless such delay was (i)

consistent with the objectives of the Joint Development Plan and

the result of issues outside the control of the parties, or (ii)

consented to by the Co-Chairperson in writing. (CSA § 2.4.)

In addition, the CSA required AstraZeneca to "use Diligent

Efforts to develop the Products . . . consistent with and in

furtherance of the Joint Development Plan . . . ." (CSA §

10.1.1.) The CSA defined "Diligent Efforts" as:

> [W]ith respect to the Purchaser, efforts and resources
> used by the Purchaser for its own compounds or products
> with similar commercial and scientific potential and at
> a similar stage in their lifecycle, taking into
> consideration their safety and efficacy, their cost to
> develop, the competitiveness of alternative or
> competing compounds or products, and the nature and
> extent of their market exclusivity (including Patent
> coverage and regulatory exclusivity), the likelihood of
> regulatory approval, their expected profitability,
> including the amounts of marketing and promotional
> expenditures with respect to the Products and all other
> relevant factors . . . .

(CSA § 1.) The Diligent Efforts standard was referenced

elsewhere in the CSA.[6] The parties agreed that AstraZeneca's

---

[6] See, e.g., CSA § 2.2 ("[AstraZeneca] shall perform the Purchaser Transition
Services and use Diligent Efforts to execute the Joint Development Plan for
the development of the Products . . . ."); CSA § 3.3 ("The Studies shall be
conducted by the Parties using their respective Diligent Efforts in accordance

obligation to use Diligent Efforts in connection with its
contractual duties would expire on the earlier of (i) the Earnout
Payment Date, (ii) the EPT Date, or (iii) the date of other
expiration or termination of the CSA. (Id.)

Finally, the APA restricted Verus's right to compete with
Defendants for five years.  However, there was no corresponding
non-compete agreement by Defendants.  (APA § 5.12.)

### 3. Performance Under the Agreements

The parties executed the APA in May 2007 and the CSA and the
ROA in August 2007.  (Compl. ¶¶ 22, 29, 43.)  AstraZeneca then
began research and development pursuant to the Joint Development
Plan, which set forth key project objectives embodied in the
Study Schedules.  One such objective was to seek an EOP II
Meeting with the FDA based on AstraZeneca's pre-clinical studies.

Verus alleges that the parties originally contemplated that
the EOP II Meeting might take place prior to October 2, 2008, but
they later concluded that a meeting in that timeframe would not
be possible.  (Compl. ¶¶ 52-54.)  In its minutes from November
19, 2007, the JDC recognized that completing Schedule 3 (a mouse
study) would be "tight for the EOP II meeting."  (Compl. ¶ 52.)
And in its minutes from June 24 and June 25, 2008, the JDC
acknowledged that the EOP II Meeting was not expected to occur
until January 2009.  (Compl. ¶ 56.)

As indicated in the JDC meeting minutes of June 24 and June

with the Study Schedules, as shall be directed by the Joint Development

6

25, 2008, preliminary pre-clinical test results revealed safety concerns.  For example, the minutes include discussions of test rats becoming "hopeless" and "a concern" over the "histiocytosis results" of studies delivering the formulation to dogs. (Defs.' Mem. Ex. 2.)

According to the Complaint, "the tenor of the communication during the September 3, 2008 JDC meeting began to abruptly change from the AstraZeneca side of the table." (Compl. ¶ 57.) AstraZeneca "proposed that the Joint Development Committee discontinue Study Schedules 6 . . . and 8 (the End of Phase 2 meeting with the FDA).  AstraZeneca's stated reason for wanting to discontinue Study Schedules 6 and 8 was 'because of AZ's safety concerns of the current formulation or any reformulation of the compound.'"  (Compl. ¶ 57.)  Importantly, nowhere in Verus's Complaint or memorandum in opposition to Defendants' motion for dismissal does Verus contest the validity of AstraZeneca's safety concerns.

Two weeks later, at a JDC meeting on September 18, 2008, an AstraZeneca representative "asked for Verus' intentions relative to the exercise of its repurchase option." (Compl. ¶ 58.) Defendants regard this query as significant because, in their view, it indicates that Verus was on notice prior to the EOP II Drop Dead Date of October 2, 2008 that (1) AstraZeneca did not intend to go forward with the development of the assets; (2)

Committee in its sole discretion . . . .").

AstraZeneca was not using "commercially reasonable best efforts to mitigate" the delay in the EOP II Meeting (as required to extend the EPT Date); and (3) AstraZeneca did not intend to make the Earnout Payment.  In Defendants' view, this query put Verus on notice that it would soon have to decide whether to exercise its repurchase option.  (Defs.' Mem. 17.)

On October 8, 2008, AstraZeneca delivered to Verus the LAC, listing zero dollars as the Loss Amount.  (Compl. ¶ 59.)  Verus responded to the LAC with an October 22, 2008 letter acknowledging receipt of the LAC and asserting that it was premature and incomplete.  (Compl. ¶ 61.)[7]  Verus also "asked for confirmation of several open items under the [CSA] and the [ROA], as well as clarification of several open items on the [LAC] itself, in particular the liabilities to be assumed by Verus at the Repurchase Closing."  (Compl. ¶ 61; Defs.' Mem. Ex. 6.)  In its October 30, 2008 response, AstraZeneca claimed that the LAC was complete.  Nevertheless, AstraZeneca provided some additional information, while maintaining that it was not obligated to do so under the Agreements.  (Compl. ¶ 62.)

The JDC met on November 6, 7, 18 and 24, 2008 to discuss the proposed discontinuation of the Study Schedules in light of AstraZeneca's position that "[b]ased upon the overall inhalation toxicity package results, the development and regulatory approval

---

[7] As discussed below, Verus argues that the zero dollar Loss Amount was incomplete because the Study Schedules had not yet been completed and therefore the costs and liabilities incurred by Defendants would have increased in the future.  (Pl.'s Opp. Mem. 22.)

of [the product] is no longer practicable, and the expected [EOP II] Meeting with the FDA is not feasible." (Compl. ¶¶ 63-65.)

On November 24, 2008, "in order to preserve its Repurchase Option rights" "in the event that such notice was later deemed required at that time," Verus delivered a "Notice of Election to Exercise Repurchase Option" to AstraZeneca. (Compl. ¶ 66; Defs.' Mem. Ex. 6.)  In the Notice, Verus exercised its Repurchase Option "subject to the following conditions":

> (a) our receipt of evidence satisfactory to us that the maximum total exposure with respect to non-cancellable liabilities (whether or not currently due and payable, contingent or threatened) to be assumed by Verus in connection with the closing of the Repurchase Option are not in excess of $200,000;
>
> (b) . . . AstraZeneca will pay for, or transfer value to Verus of an amount equal to, the budgeted amounts for . . . Study Schedules being discontinued [including Study Schedule 8 (the EOP II Meeting)] . . . ; and
>
> (c) AstraZeneca will perform in full its obligations under the Repurchase Option Agreement . . . .

(Compl. ¶ 66; Defs.' Mem. Ex. 6.)

AstraZeneca responded in a letter dated December 5, 2008, noting that Verus's conditions "would impose material and new obligations and liabilities on Tika beyond those already contractually agreed to by the parties in the [CSA] and the [ROA]." (Compl. ¶ 67; Defs.' Mem. Ex. 6.)  The letter further stated that these conditions were not acceptable to AstraZeneca. (Id.)  Therefore, AstraZeneca asserted, Verus's November 24 communication was not a valid option exercise notice but was instead a counteroffer that AstraZeneca was free to reject.

AstraZeneca rejected Verus's counteroffer.  (Id.)  "[G]iven that
the Repurchase Option Termination Date has now elapsed,"
AstraZeneca's letter concluded, "Verus's right to exercise the
Repurchase Option has terminated in accordance with Sections 2.2
and 9.1 of the [ROA]."  (Id.)

On or about December 19, 2008, AstraZeneca revealed that it
had entered into a license agreement with Map Pharmaceuticals
Inc. ("Map") for a rival product formulation for the treatment of
pediatric asthma.  (Compl. ¶ 68.)

Verus brought suit against Defendants in New York State
Supreme Court on May 26, 2009, asserting causes of action for
breach of contract, fraud, conversion, anticipatory breach,
breach of the implied covenant of good faith and fair dealing,
and unjust enrichment.  Defendants removed the action to this
Court on June 22, 2009.  Before the Court is Defendants' motion
for dismissal pursuant to Federal Rules of Civil Procedure 9(b)
and 12(b)(6).  For the reasons that follow, Defendants' motion is
granted.

**LEGAL STANDARD**

Rule 12(b)(6) of the Federal Rules of Civil Procedure
provides for dismissal of a complaint that fails to state a claim
upon which relief may be granted.  "In ruling on a motion to
dismiss for failure to state a claim upon which relief may be
granted, the court is required to accept the material facts
alleged in the complaint as true."  Frasier v. Gen. Elec. Co.,

930 F.2d 1004, 1007 (2d Cir. 1991).  The court is also required
to read a complaint generously, drawing all reasonable inferences
from its allegations in favor of the plaintiff.  See California
Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 515
(1972).

　　　"While a complaint attacked by a Rule 12(b)(6) motion to
dismiss does not need detailed factual allegations, a plaintiff's
obligation to provide the grounds of his entitlement to relief
requires more than labels and conclusions, and a formulaic
recitation of the elements of a cause of action will not do."
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal
quotations omitted).  Instead, a plaintiff must assert "enough
facts to state a claim to relief that is plausible on its face."
Id. at 570.  "A claim has facial plausibility when the pleaded
factual content allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged."
Ashcroft v. Iqbal, 556 U.S. ---, 129 S. Ct. 1937, 1940 (2009).

### DISCUSSION

　　　In its Complaint, Verus alleges that: (1) Defendants
breached section 5.3.3 of the APA by failing to reach an EOP II
Meeting with the FDA, (Compl. ¶¶ 82-87.); (2) Defendants breached
the ROA by rejecting Verus's exercise of its repurchase option,
(Compl. ¶¶ 102-110.); (3) Defendants breached the CSA by failing
to reach an EOP II Meeting with the FDA, (Compl. ¶¶ 88-95.); (4)
Defendants committed fraud by misrepresenting material facts to

11

Verus about their intent, commitment and ability to research and develop Verus's assets, (Compl. ¶¶ 77-78.); (5) Defendants converted Verus's property rights in the assets, (Compl. ¶¶ 121-125.); and (6) Defendants (a) anticipatorily breached the Agreements, (b) breached the implied covenant of good faith and fair dealing, and (c) were unjustly enriched (Compl. ¶¶ 111-20, 126-129). For the reasons discussed below, Verus's causes of action fail to state claims for which relief can be granted.

### 1. Breach of the APA (Count 2)

Verus alleges that Defendants breached provisions of the APA, ROA and CSA that require Defendants to reach an EOP II Meeting in order to obtain guidance from the FDA on large scale clinical trials. (Compl. ¶¶ 82-101.) These claims fail as a matter of law.

In Count Two, Verus alleges that Section 5.3.3 of the APA--which requires Defendants to use commercially reasonable efforts to cooperate with Verus in connection with any investigation by a "Governmental Authority"--obligated Defendants to request and attend an EOP II meeting with the FDA, and to submit all necessary study results to the FDA. (Compl. ¶ 84.)[8] Defendants argue that Section 5.3.3 is a "boilerplate provision, found in many asset and stock purchase agreements" that "plainly relates to a transaction-related regulatory process, like an antitrust

---

[8] Section 5.3.3 of the APA provides, in relevant part: "Each of the Parties hereto shall use its commercially reasonable efforts to cooperate with each other in connection with any filing and in connection with any investigation by any Governmental Authority related to the Contemplated Transactions . . .

review, not to the parties' collaboration in developing and seeking FDA approval of [the assets], which was the subject of the subsequently executed CSA." (Defs.' Mem. 21, 24.)   The Court agrees.

First, although the APA requires each party to cooperate with each other "in connection with any investigation by any Governmental Authority," (APA § 5.3.3), Verus does not allege that there ever was a government investigation. (Indeed, Verus's claims are predicated on its complaint that there was no EOP II Meeting with the government.) Under the terms of APA § 5.3.3, absent any governmental investigation Defendants had no obligation to cooperate with Verus in this way.

In addition, it is clear that the APA addresses the mechanics and sequence of the dual-option asset purchase transaction, while the CSA addresses the parties' cooperation obligations in connection with developing the assets--including reaching the EOP II meeting. Under the CSA, Defendants were obligated to develop the assets in accordance with the Diligent Efforts standard described above. Reading into section 5.3.3 an independent and potentially inconsistent obligation to complete certain studies and reach certain FDA benchmarks no matter the circumstances would materially frustrate the CSA's comprehensive scheme covering the same subject matter. As the APA expressly provides that the APA, CSA and ROA together constitute "the

_____

." (APA § 5.3.3.)

13

entire agreement among the parties," (APA § 11.4), the Court must read APA § 5.3.3 in the context of all three Agreements.  See Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) ("Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract.  It is also important to read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases.") (internal citation omitted).

Finally, the Court agrees with Defendants that, when read in context, section 5.3.3's reference to any "investigation by any Governmental Authority" means a pre-transaction regulatory approval investigation, not an EOP II Meeting.  Section 5.3 ("Notices and Consents") is located between two other pre-closing covenants, and the directly proceeding provision (section 5.3.2.) requires the parties to cooperate in the preparation and filing of reports under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, which imposes filing requirements prior to a merger or major asset transaction.  (APA § 5.3.2.)  Therefore, read in context, the governmental investigation referred to in section 5.3.3 does not encompass an EOP II Meeting.

For these reasons, the Court GRANTS Defendants' motion to dismiss Count Two.

### 2.  Breach of the ROA (Count 5)

Next, Verus charges that Defendants breached the ROA by either (a) failing to send a timely and complete LAC or (b)

14

rejecting Verus's exercise of its repurchase option, (Compl. ¶¶ 102-110.)   This claim--as well as Verus's claim that Defendants breached the CSA by failing to reach an EOP II Meeting with the FDA (Counts 3 and 4), discussed below--is based on Verus's assertion that the EPT Date did not occur on October 2, 2008. The Court will therefore determine when the EPT Date occurred, as this will resolve Verus's remaining contract claims.

In Verus's view, AstraZeneca wrongfully and prematurely terminated the Agreements: "[S]ince the official minutes of the end-of-Phase 2 meeting had not been issued or the end-of-Phase 2 meeting had not occurred by the EOP II Drop Dead Date, the EOP II Drop Dead Date was automatically extended" until 45 days after the issuance of the minutes of the EOP II Meeting.   (Compl. ¶ 27; Pl.'s Mem. 29.)   Therefore, Verus reasons, the Agreements never terminated and Defendants were required to continue to use Diligent Efforts to complete the Study Schedules and to request and attend an EOP II Meeting with the FDA.   (Pl.'s Mem. 27-33.) Verus also argues that because the LAC could not properly be sent until after the EPT Date, AstraZeneca's "transmission of the purported Loss Amount Certificate was untimely, and triggered no deadlines (including, but not limited to, the deadline for Verus to exercise its repurchase option."   (Pl.'s Mem. 20.)

Defendants respond that under the plain language of the Agreements, the EOP II Drop Dead Date is only extended if AstraZeneca was "using commercially reasonable best efforts to

mitigate" a delay in reaching the EOP II Meeting.   (Defs.' Mem 26.)   Because Verus knew in September 2008 that AstraZeneca had abandoned pursuing an EOP II Meeting with the FDA,[9] Verus knew that AstraZeneca was no longer making commercially reasonable best efforts to mitigate the delay in reaching an EOP II Meeting. Thus, the EPT Date was not extended beyond October 2, 2008.

The Court agrees with Defendants and finds that the EPT Date was October 2, 2008.   Under the APA, the EPT Date occurs on the earlier of 45 days after the issuance of the EOP II Meeting minutes or the EOP II Drop Dead Date (October 2, 2008), "provided, however, that in the event the official minutes of the end-of-Phase 2 meeting has not been issued or the end-of-Phase 2 meeting has not occurred by the EOP II Drop Dead Date and the Purchaser is using commercially reasonable best efforts to mitigate such delay," the EOP II Drop Dead Date is automatically extended until 45 days after the issuance of the minutes.   (APA Ex. 1 at S-6 (emphasis added).)   Thus, the EPT Date would not be automatically extended from October 2, 2008 unless AstraZeneca was using commercially reasonable best efforts to mitigate a delay in reaching the EOP II meeting.

Verus's allegations make clear that in September 2008 Verus knew that AstraZeneca was not making such efforts.   The Complaint alleges that "Defendants refused to . . . request and attend an End of Phase 2 meeting with the FDA."   (Compl. ¶ 85.)   Similarly,

---

[9] As discussed, at a JDC meeting on September 18, 2008, an AstraZeneca representative "asked for Verus' intentions relative to the exercise of its

16

the Complaint alleges that "the tenor of the communication during the September 3, 2008 Joint Development Committee meeting began to abruptly change from the AstraZeneca side of the table," in that AstraZeneca "proposed that the Joint Development Committee discontinue Study Schedules 6 . . . and 8 (the End of Phase 2 meeting with the FDA)" due to safety concerns. (Compl. ¶ 57) According to its own allegations, then, Verus knew that AstraZeneca was not using commercially reasonable best efforts to mitigate the delay in reaching the EOP II Meeting.

Likewise, at the JDC meeting on September 18, 2008, an AstraZeneca representative "asked for Verus' intentions relative to the exercise of its repurchase option." (Compl. ¶ 58.) This communication reveals that prior to October 2, 2008, Verus knew that AstraZeneca was not using commercially reasonable best efforts to mitigate the delay in the EOP II Meeting and AstraZeneca did not intend to make the Earnout Payment. Verus was therefore on notice that it would soon have to decide whether to exercise its repurchase option. (Defs.' Mem. 17.) Because the Complaint alleges that AstraZeneca was not making commercially reasonable best efforts to mitigate the delay in reaching the EOP II Meeting, there was no automatic extension and the EPT Date was October 2, 2008.

This finding is dispositive of Count Five--Verus's claim that Defendants breached the ROA by either (a) never sending a

repurchase option." (Compl. ¶ 58.)

17

timely and complete LAC or (b) if the LAC was timely and complete, rejecting Verus's exercise of its repurchase option. (Compl. ¶¶ 102-110.)

    With respect to (a), AstraZeneca's LAC was timely because the EPT Date was October 2, 2008 and AstraZeneca delivered the LAC to Verus on October 8, 2008, within the contractually-specified five day period.  (APA § 9.6.2.)  As for the LAC's completeness, Verus alleges that upon receiving the LAC from AstraZeneca, it "asked for confirmation of several open items under the [CSA] and the [ROA], as well as clarification of several open items on the [LAC] itself, in particular the liabilities to be assumed by Verus at the Repurchase Closing. Verus made it clear that, until all of the items in its October 22, 2008 letter were addressed, the purported [LAC] could not be considered complete."  (Comp. ¶ 61.)  Verus argues that because the Study Schedules had not been completed, the Loss Amount was incomplete because the zero dollar stated Loss Amount "would have continued to increase up to the [EPT] Date."  (Pl.'s Mem. 22.) (As discussed, the Loss Amount is an aggregate of the contractual indemnity claims that AstraZeneca submitted to Verus. (APA § 9.6.1, 9.6.2; ROA § 12.4.))  But as Defendants point out, under the CSA, the only indemnity that AstraZeneca could seek from Verus was for losses that AstraZeneca suffered as a result of Verus's intentional misconduct or gross negligence in performing its obligations under the CSA (or for material breach of

18

contractual warranties), and AstraZeneca never sought indemnity from Verus for such conduct. (CSA § 15.2.) And to the extent that Verus is referring to liabilities incurred by AstraZeneca in developing the assets, those are not components of the Loss Amount; rather, they were to be included in the Assumed Liabilities that Verus would assume at a Repurchase Closing. (ROA § 2.3.1, 3.3.) Therefore, Verus's allegation that Defendants breached the ROA by failing to send a timely and complete LAC is without merit.[10]

Verus's alternative theory as to how Defendants breached the ROA--that Defendants improperly rejected Verus's exercise of its repurchase option--is similarly meritless. Verus alleges that "to the extent that the Court determines that Defendants timely sent a complete [LAC], Verus duly exercised its right to exercise the Repurchase Option in a timely fashion" and Defendants improperly "refused to perform pursuant to the [ROA]." (Compl. ¶¶ 107-08.) This argument is unavailing.

Because AstraZeneca delivered the LAC to Verus on October 8, 2008, Verus's Repurchase Option terminated on November 24, 2008-- the first business day 45 days after October 8, 2008. (ROA §§ 2.2, 9.1.) On November 24, 2008, Verus sent AstraZeneca a letter purporting to exercise its option. (Defs.' Mem. Ex. 6.) Although the letter gave notice of Verus's "election to exercise

---

[10] In any event, the APA provides that in the event of a dispute over the Loss Amount, Verus's "sole and exclusive recourse" would be to provide written notice to Defendants and to attempt to resolve the issue in good faith or submit the issue to non-binding arbitration, without delaying the repurchase

the Repurchase Option for the Repurchase Price of $1.00," Verus

stated its exercise was "subject to the following conditions":

> (a) our receipt of evidence satisfactory to us that the maximum total exposure with respect to non-cancellable liabilities . . . to be assumed by Verus in connection with the closing of the Repurchase option are not in excess of $200,000; (b) if Verus confirms the maximum total exposure as set forth in (a) above, Verus will consent to AstraZeneca's proposal to discontinue [certain] Study Schedules . . . and AstraZeneca will pay for . . . the budgeted amounts for such Study Schedules being discontinued . . .; and (c) AstraZeneca will perform in full its obligations under the [ROA] . . . .

(Defs.' Mem. Ex. 6.)  However, nothing in the ROA (or the APA or

CSA for that matter) permitted Verus to limit the liabilities it

assumed in the repurchase transaction or to condition its option

exercise on capping those liabilities.  These extra-contractual

conditions--which sought to impose materially different terms and

conditions than those to which the parties had agreed--rendered

Verus's purported option exercise a counteroffer, which

AstraZeneca was free to (and did) reject.  See Duane Sales, Inc.

v. Carmel, 49 N.Y.2d 862, 427 N.Y.S.2d 930 (1980); see also

Mohring Enter., Inc. v. HSBC Bank USA, 291 A.D.2d 385, 736

N.Y.S.2d 888 (2d Dep't 2002) ("It is well settled that the

optionee must exercise the option in accordance with its terms

within the time and in the manner specified in the option.").

AstraZeneca was therefore entitled to reject Verus's

counteroffer, which it did by letter dated December 5, 2008.

(Defs.' Mem. Ex. 7.)

closing.  (APA § 9.6.3.)

As Verus failed to properly exercise its repurchase option by November 24, 2008, the option terminated; Verus lost the right to repurchase the assets under the ROA; and AstraZeneca no longer had any obligation to perform under that contract.  Therefore, Verus's claim for breach of the ROA (Count Five) must be dismissed.

### 3. Breach of the CSA (Counts 3 and 4)

In Counts three and four, Verus alleges that Defendants breached the CSA by: failing to prepare certain studies in accordance with the Study Schedules and by failing to submit them to the JDC for approval; refusing to coordinate and prepare for the JDC's review all regulatory filings and communications for submission to the FDA; and discontinuing studies without the consent of Verus's representative on the JDC.  (Compl. ¶¶ 88-101.)

Verus misunderstands the nature of Defendants' obligations under the CSA.  The CSA does not contain an unqualified requirement to reach an EOP II meeting.  Rather, the CSA obligates AstraZeneca to "use Diligent Efforts to develop the Products . . . consistent with and in furtherance of the Joint Development Plan . . . ."  (CSA § 10.1.1.)  As discussed, this means that AstraZeneca was required to develop the assets as if they were its own, "taking into consideration," among other things, "their safety and efficacy, their cost to develop, [and] the competitiveness of alternative or competing compounds or

21

products."   (CSA § 1 (emphasis added).)   There is simply no
unequivocal command in the CSA that Defendants reach an EOP II
meeting with the FDA.   As long as it exercised its Diligent
Efforts, AstraZeneca had the contractual right to decide to cease
product development before reaching an EOP II meeting.

AstraZeneca argues that it discontinued the development of
the assets because the formulation suffered from toxicity
problems and, due to these safety concerns, AstraZeneca concluded
that commercial development of the assets was impractical.
(Defs.' Mem. 16-18.)   Importantly, as AstraZeneca notes, nowhere
in its Complaint or opposition brief does Verus contest the
validity of these safety concerns.   In fact, according to Verus's
allegations, in September 2008 AstraZeneca "proposed that the
Joint Development Committee discontinue Study Schedules 6 . . .
and 8 (the End of Phase 2 meeting with the FDA)" "'because of
AZ's safety concerns of the current formulation or any
reformulation of the compound.'"   (Compl. ¶ 57.)   Thus, it is
undisputed that, in exercising its Diligent Efforts, AstraZeneca
concluded that further product development (including an EOP II
meeting) was not safe or practical.

Verus's other claims based on the CSA also fail.   Verus
asserts that section 2.2 of the CSA imposed an unqualified
obligation on Defendants to "execute" the Joint Development Plan
and "generate" work product.   But this argument ignores the fact
that those commands are also subject to the Diligent Efforts

22

standard. (CSA § 2.2 ("The Purchaser shall . . . use Diligent Efforts to execute the Joint Development Plan . . . and generate the applicable Work Product.").)  Similarly, Verus alleges that an EOP II meeting was required by section 3.5 of the CSA, but that provision merely states that AstraZeneca (as opposed to Verus) "shall be responsible for coordinating and preparing for the Joint Development committee's prior review and approval all regulatory filings and all communications for submission to the FDA . . . ." (CSA § 3.5.)  This clause simply gives AstraZeneca principal control of the regulatory process if AstraZeneca decided, in the exercise of its Diligent Efforts, that regulatory approval was worth pursuing.  Likewise, while section 3.1 states that each party will be responsible for running the studies under its own control, those obligations remain subject to the overarching Diligent Efforts standard--there is no invariable command that every study must be completed.  (CSA § 3.1.)  And although AstraZeneca failed to comply with the technical requirements of Section 4.4.14 by discontinuing certain Study Schedules without the consent of the Verus-appointed JDC Co-Chairperson,[11] this was irrelevant because AstraZeneca had concluded that development of the product was no longer practical.

For these reasons, the Court GRANTS Defendants' motion to dismiss Counts Three and Four.

---

[11] Section 4.4.14 of the CSA gives the JDC responsibility to determine whether to discontinue any study.

23

## 4. Fraud (Count 1)

Next, Verus alleges that Defendants committed fraud by making misrepresentations of material facts concerning their intent, commitment and ability to research and develop Verus's assets through an EOP II meeting. Verus claims that at the outset Defendants "knew that they intended to continue researching and developing [the product] only so long as it was in their commercial interest to do so." (Compl. ¶¶ 77-78.)

Verus's fraud claim fails for multiple reasons. First, it fails to meet the requirements of Federal Rule of Civil Procedure 9(b), which requires a fraud claim to be pled with particularity. Under that standard, a complaint must "(1) specify the statements, oral, or written, that the plaintiff contends were fraudulent, either as misrepresentations or containing fraudulent omissions; (2) identify the speaker or the writer; (3) state where, when and to whom the statements were made; and (4) explain why the statements were fraudulent." Carmona v. Spanish Broadcasting Sys., Inc., No. 08 Civ. 4475(LAK), 2009 WL 890054, *4 (S.D.N.Y. Mar. 30, 2009). Although the Complaint identifies numerous alleged misrepresentations, it does not identify by whom, where, or when these statements were made. (Compl. ¶ 20.) This does not satisfy the Rule 9(b) standard.

In addition, Verus's fraud claim is redundant of its breach of contract claims. Under New York law, "where a fraud claim arises out of the same facts as plaintiff's breach of contract

24

claim, with the addition only of an allegation that defendant

never intended to perform the precise promises spelled out in the

contract between the parties, the fraud claim is redundant and

plaintiff's sole remedy is for breach of contract." Telecom

Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 196 (2d Cir.

2001). As Verus itself asserts, its fraud claim arises from

"Defendants' wrongful conduct and blatant disregard for their

contractual obligations . . . ." (Compl. ¶ 1 (emphasis added).)

At bottom, Verus's fraud claim is that AstraZeneca allegedly made

sweeping statements about its capabilities and expertise in drug

development, and its intent to perform under the Agreements, and

then allegedly failed to perform under the Agreements. See, e.g.

(Compl. ¶ 20 (alleging that Defendants represented to Verus that

they "were committed to the sustainable development of the

collaborative effort with Verus" and that they "were committed to

focusing their resources on the collaborative efforts with

Verus").) Because this fraud claim arises out of the same set of

facts as Verus's breach of contract claims, and Verus merely adds

the allegation that Defendants never intended to perform under

the contracts, "the fraud claim is redundant and plaintiff's sole

remedy is for breach of contract." Telecom Int'l Am., Ltd., 280

F.3d 175 at 196.[12]

For these reasons, the Court GRANTS Defendants' motion to

---

[12] While there is an exception to this principle where Plaintiff states a claim that is collateral to the contract, that is not the situation here because developing the assets was the purpose of the Agreements and the purportedly fraudulent representations all relate to Defendants' intent and ability to

25

dismiss Count One.

**5. Conversion (Count 8)**

Verus also alleges that Defendants converted Verus's property rights in the assets. (Compl. ¶¶ 121-125.) Specifically, Verus alleges that by sending AstraZeneca a notice that it was exercising its repurchase option, Verus established its right to possession of the assets, and AstraZeneca's failure to return the assets amounts to conversion.

This claim fails because the assets in question belong to AstraZeneca, not Verus, and only the owner of property can maintain an action for conversion. See Bank of Am. Corp. v. Lemgruber, 385 F. Supp. 2d 200, 222 (S.D.N.Y. 2005). As discussed: Astra purchased from Verus the rights to develop the assets for $30 million; the EPT Date was October 2, 2008; AstraZeneca's LAC was complete and timely delivered to Verus; Verus's attempt to exercise its repurchase option on November 24, 2008 was ineffective because it was conditioned on material, extra-contractual terms; and AstraZeneca was entitled to reject Verus's counteroffer (which it did). Thus, Verus's repurchase option expired on November 24, 2008. Because the assets in question belong to AstraZeneca, Verus cannot state a claim for conversion.

Therefore, the Court GRANTS Defendants' motion to dismiss Count Eight.

---

perform those contractual obligations.

26

**6. Quasi-Contract Claims (Counts 6, 7 and 9)**

Finally, Verus alleges that Defendants (a) anticipatorily breached the Agreements (Count 6), (b) breached the implied covenant of good faith and fair dealing (Count 7), and (c) were unjustly enriched at Verus's expense (Count 9) (Compl. ¶¶ 111-20, 126-129).  These quasi-contract claims fail as a matter of law.

(a) Anticipatory breach of the Agreements (Count 6)

Verus alleges that Defendants "wrongfully repudiated [the Agreements] and have abandoned all of their obligations under each of the Agreements."  (Compl. ¶ 113.)  However, anticipatory breach or repudiation simply means that "the promisee gets to choose whether the breach occurs at the time of the anticipatory repudiation, or at the time for performance."  Lucente v. Int'l Bus. Machs. Corp., 146 F. Supp. 2d 298, 309 n.5 (S.D.N.Y. 2001) (emphasis omitted) (citing 23 Williston on Contracts § 1337). As Verus determined that, in its view, the Agreements had already been breached and as Verus has brought this action for breach of contract, it cannot simultaneously pursue a claim for anticipatory breach.  Therefore, the Court GRANTS Defendants' motion to dismiss Count Six.

(b) Breach of the implied covenant of good faith and fair dealing (Count 7)

Verus alleges that AstraZeneca breached the implied covenant of good faith and fair dealing in the Agreements.  (Compl. ¶¶ 118-19.)  "The majority of courts in this district have found

that a claim of breach of the implied covenant of good faith and fair dealing based on the same facts as a breach of contract claim asserted in the same complaint is redundant and must be dismissed on a motion to dismiss." Aledia v. HSH Nordbank AG, No. 08 Civ. 4342, 2009 WL 855951, at *4 (S.D.N.Y. Mar. 25, 2009) (emphasis added). Verus's allegations in Count Seven do not add any new allegations against AstraZeneca but merely incorporate "[t]he above acts" of Defendants. (Compl. ¶¶ 116-119.) Therefore, Verus's claim of breach of the implied covenant of good faith and fair dealing is duplicative of its breach of contract claims. Accordingly, the Court GRANTS Defendants' motion to dismiss Count Seven.

### (c) Unjust enrichment (Count 9)

Finally, Verus alleges that "as a result of their misrepresentations and omissions, Defendants have unjustly received substantial economic benefits" and "have acted wrongfully by retaining [them]." (Compl. ¶¶ 127-28.) But "[a] party cannot recover in quantum meruit if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim." Aledia v. HSH Nordbank AG, No. 08 Civ. 4342(BSJ), 2009 WL 855951, at *4 (S.D.N.Y. Mar. 25, 2009).[13] Because Verus's unjust enrichment claim is based on the same facts as its breach of contract claims, a "valid, enforceable contract . . . governs the same subject matter as the [unjust

---

[13] Under New York law, quantum meruit and unjust enrichment are considered interchangeable quasi-contract claims. See Newman & Schwartz v. Asplundh Tree

28

enrichment] claim" and supersedes it.   Therefore, the Court
GRANTS Defendants' motion to dismiss Count Nine.

## CONCLUSION

For the reasons set forth above, Defendants' motion to
dismiss Plaintiff's claims is GRANTED in its entirety.   The Clerk
of Court is directed to close this case.

**SO ORDERED:**

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:   New York, New York
         August /6, 2010

---

Expert Co., 102 F.3d 660, 663 (2d Cir. 1996).